**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
In re:

      **RYYZ, LLC,**
      **and**
      **RYYZ 2, Corp.,**
      **d/b/a Westbrook Apartments,**

                                **Debtors.**
-----------------------------------------------------------------------X

                            **Chapter 11**

                            **Case No. 1-12-47383-JF and**
                            **Case No. 1-12-47384-JF**

                            **JOINTLY ADMINISTERED**

**DECISION AND ORDER GRANTING FANNIE MAE'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)(3)**

**APPEARANCES:**

Gary F. Eisenberg, Esq.
**PERKINS COIE LLP**
**30 Rockefeller Plaza, 25th Floor**
**New York, NY 10112**
*Counsel for Fannie Mae*

Albert A. Ciardi, III, Esq.
Jennifer E. Cranston, Esq.
Daniel S. Siedman, Esq.
**CIARDI CIARDI & ASTIN**
**One Commerce Square**
**2005 Market Street, Suite 1930**
**Philadelphia, PA 19103**
*Counsel for RYYZ, LLC and RYYZ 2, Corp.*

**JEROME FELLER**
**United States Bankruptcy Judge**

Before the Court is Fannie Mae's motion for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(3) in the jointly administered, single asset real estate cases of RYYZ, LLC ("LLC") and RYYZ 2, Corp. ("Corp.") (together, "Debtors"). Based on the entire record and applicable law, Fannie Mae's motion is granted. The Debtors did not demonstrate that their plan has a reasonable prospect of being confirmed within a reasonable time as required by Section 362(d)(3)(A). This conclusion is premised on the Debtors' inability to establish (i) they can obtain acceptance of their plan by at least one validly impaired class of claims (*see* 11 U.S.C. §§ 1111(b), 1122, 1129(a)(10), 1129(b)(1)) and/or (ii) their plan does not violate the absolute priority rule (*see* 11 U.S.C. § 1129(b)(2)(B)). As the Debtors also failed to make the payments required by Section 362(d)(3)(B), relief from the stay must be granted. This Memorandum Decision and Order constitutes the Court's findings of fact and conclusions of law to the extent required by Fed. R. Civ. P. 52, made applicable here by Fed. R. Bankr. P. 7052.

## I.

The Debtors each filed petitions for relief under Chapter 11 of title 11 of the United States Code on October 18, 2012, designating their business as "single asset real estate." ECF No. 1.[1] The Debtors are New York-based entities with the same principals, Joseph Jusewitz and Nediva Schwartz. ECF No. 30. Each debtor owns a portion of a 495- to 500-unit rental apartment complex situated on 43 acres of land in Lake County, Gary, Indiana ("Property"). ECF Nos. 86-2 ¶ 2; 92 at 10. LLC owns Westbrook Apartments Phase I, containing some 350 rental units, and Corp. owns Westbrook Apartments Phase II and its approximately 140 units. ECF Nos. 33-6; 33-12. The bulk of the units command monthly rent between $560 and $600, and the Debtors indicate that some 400 of them are rented. ECF Nos. 86-2 ¶ 5; 92 at 10.

---

[1] The Court will refer to the Debtors' filings in the singular form and, for ease of reference, record citations will be to Case No. 12-47383, unless otherwise indicated.

Fannie Mae is a secured creditor by virtue of certain multifamily notes, securitization instruments, and assignments ("loan documents"). ECF No. 33 (Exhs. A-Q).[2] The aggregate principal sum of the notes is slightly more than $13.5 million, consisting of a $10.5 million note dated March 19, 2007, signed by Schwartz on behalf of LLC in connection with Phase I (ECF No. 33-3), and a note of just over $3 million dated January 2, 2009, executed by Jusewitz on behalf of Corp. for Phase II (ECF No. 33-9). Both notes are secured by first-priority mortgages, assignments of rents and leases, and security agreements. ECF Nos. 33-4; 33-10. In addition, Jusewitz and LLC are guarantors of Corp.'s Phase II note. ECF Nos. 35-15; 33-16.

In July 2012, the Debtors defaulted under the loan documents by failing to pay the sums due. ECF No. 33 ¶ 24. Fannie Mae accelerated the debt and commenced a foreclosure proceeding in Lake County Superior Court. *Id.* ¶¶ 24-29. That action was stayed when the Debtors filed their bankruptcy petitions. Fannie Mae filed two proofs of claim, for an aggregate claim of over $12.3 million. Case No. 12-47383 (POC 12-1); Case No. 12-47384 (POC 3-1).

Fannie Mae's security interest extends to the post-petition rents generated by the Property pursuant to the assignments of rents and leases and by operation of 11 U.S.C. § 552(b). Four orders have been entered on consent of Fannie Mae authorizing the Debtors' use of cash collateral on an interim basis pursuant to stipulated terms and in accordance with certain budgets. ECF Nos. 28; 52; 70; 87. The last order covered February 2013.

On November 19, 2012, just a month after the petition date, Fannie Mae filed a motion for relief from the stay for cause pursuant to 11 U.S.C. § 362(d)(1). ECF Nos. 31; 32; 33. The motion was couched in terms of lack of adequate protection, but Fannie Mae also argued that reorganization was impossible based on the Debtors' insufficient cash flow. ECF No. 47 at 3-4.

---

[2] The loan documents are governed by Indiana law and require disputes to be heard in the state and federal courts of Indiana. *See, e.g.*, ECF Nos. 33-3 §§ 17, 20; 33-4 § 30; 33-6 § 21; 33-9 § 17; 33-10 § 30; 33-15 § 14.

On December 19, the day before the scheduled hearing on the motion, the Debtors filed a plan of reorganization and disclosure statement. ECF Nos. 54; 55. As Fannie Mae had not sustained its burden of demonstrating diminution of the value of its collateral, and in light of the early stage of the case, the Court denied the motion without prejudice. ECF Nos. 61; 62 at 16:2-22.

Fannie Mae filed the present motion on January 31, 2013 (ECF Nos. 76; 77; 78; 79), the Debtors filed an objection on February 28 (ECF No. 86), and Fannie Mae filed a reply on March 5 (ECF No. 89). On March 11, the Debtors filed an amended plan and disclosure statement. ECF Nos. 91; 92. The Court held a hearing on the motion on March 14, 2013, at which counsel for Fannie Mae and the Debtors appeared and were heard, and reserved decision.

## II.

The filing of a bankruptcy petition begets a stay of foreclosure proceedings brought by secured lenders to recover their collateral. 11 U.S.C. § 362(a). Unlike injunctive relief in other courts, a debtor need not demonstrate likelihood of success, irreparable harm, or any other factors to obtain stay relief; the bankruptcy stay is by name, and by nature, automatic. "However, restraining creditors from enforcing their legitimate legal rights is strong medicine and our bankruptcy laws do not sanction the stay for stay's sake." *In re 266 Washington Assocs.*, 141 B.R. 275, 281 (Bankr. E.D.N.Y.) ("*266 Washington*"), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992).

Accordingly, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay . . . ." 11 U.S.C. § 362(d). Under paragraph (1) of subsection (d), relief may be granted "for cause, including the lack of adequate protection of an interest in property of such party in interest;" and under paragraph (2), relief "with respect to a stay of an act against property" is

warranted if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization . . . ." 11 U.S.C. § 362(d)(1) and (2).

Congress enacted 11 U.S.C. § 362(d)(3) in 1994 to fast-track single asset real estate cases.[3] Section 362(d)(3) compels debtors to act swiftly by obligating them to fulfill one of two mandates by "not later than the date that is 90 days after the" petition date. 11 U.S.C. § 362(d)(3). The debtor must either (A) "file[] a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time" (11 U.S.C. § 362(d)(3)(A)), or, failing this, (B) make monthly payments "in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate" (11 U.S.C. § 362(d)(3)(B)(ii)). Although a court may enlarge the 90-day period for cause shown, the statute carefully circumscribes this relief by requiring the order to be *entered* before the 90-day period expires. 11 U.S.C. § 362(d)(3).

While (d)(1) and (d)(2) have general application, (d)(3) is designed specifically for single asset real estate cases. These cases typically amount to little more than a contest between the debtor and secured lender over real property that is, or can be, the subject of a foreclosure action. As explained by one court, by enacting Section 362(d)(3) "Congress expressly attempted to avoid the usual delays experienced in Chapter 11 in single asset real estate cases, which historically have been filed to avoid a foreclosure and in the hope that the debtor can come up with some form of a miracle in order to formulate an acceptable plan." *NationsBank, N.A. v. LDN Corp. (In re LDN Corp.)*, 191 B.R. 320, 326 (Bankr. E.D. Va. 1996) ("*LDN*").

---

[3] The Bankruptcy Code defines "single asset real estate" as:

> [R]eal property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto.

11 U.S.C. § 101(51B).

The term "miracle" is apt. With insufficient cash flow, an inability to obtain alternative financing, few creditors besides the lender, and quite often binding judgments of foreclosure, an attempt to satisfy the confirmation requirements of 11 U.S.C. § 1129 is often a fool's errand.[4] In many instances, the only real promise of a single asset real estate case is a "nasty and costly two-party dispute . . . ." *In re Union Meeting Partners*, 178 B.R. 664, 681 (Bankr. E.D. Pa. 1995). Under these circumstances the continuation of the automatic stay is of questionable value, and there is little reason to continue to frustrate a lender's legitimate right to pursue its collateral.[5]

Section 362(d)(3) is designed to protect secured creditors by requiring debtors to act quickly, either by filing a confirmable plan within a prescribed timeframe or by compensating the creditor with statutory payments. *See, e.g.*, *LDN*, 191 B.R. at 327 (stating that Section 362(d)(3) "was enacted to assist secured creditors in single asset real estate cases"); *In re Heather Apts. Ltd. P'ship*, 366 B.R. 45, 50 (Bankr. D. Minn. 2007) ("[W]here the case does not early kick forward toward confirmation," the purpose of Section 362(d)(3)(B) is to "compensate [the] mortgagee for the time-value of the mortgagee's debt investment, by the payment of interest at the original contractual rate.").[6] At the same time, Section 362(d)(3) provides a window of opportunity for debtors. Section 362(d)(3)'s specific, albeit nonexclusive, criteria for stay relief ought to counsel against knee-jerk motions at the outset of the case that merely parrot

---

[4] *See, e.g.*, *In re Baxter & Baxter, Inc.*, 172 B.R. 198, 201 (Bankr. S.D.N.Y. 1994) (stating that the Second Circuit "clearly looks upon the confirmation of a single-asset real estate case over the lender's objection as aberrational") (citing *Boston Post Road Ltd. P'ship v. FDIC (In re Boston Post Road Ltd. P'ship)*, 21 F.3d 477 (2d Cir. 1994) ("*Boston Post Road*"), *cert. denied*, 513 U.S. 1109 (1995)).

[5] *See, e.g.*, *In re Shea & Gould*, 214 B.R. 739, 744 (Bankr. S.D.N.Y. 1997) (noting that the Second Circuit's decision setting forth the "bad faith" factors for dismissal, furthered "the court of appeals' view that in single asset real estate cases, debtors cannot manipulate the Bankruptcy Code to thwart the legitimate rights of secured creditors") (citing *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304 (2d Cir. 1997)).

[6] As payments under 11 U.S.C. § 362(d)(3)(B) are based on the value of the property, and not the outstanding debt, they will often be less than what is due under the note. These payments arguably shift the risk of protracted cases from creditors to debtors. Kenneth N. Klee, *One Size Fits Some: Single Asset Real Estate Bankruptcy Cases*, 87 Cornell L. Rev. 1285, 1292 (2002) (noting they "also create[] a barrier to entry that discourages small real estate owners from filing for Chapter 11 relief"). However, the longer a case goes on an undersecured creditor may lose the power of its vote as an unsecured creditor if its claim is paid down. *See generally In re South Side House, LLC*, 474 B.R. 391 (Bankr. E.D.N.Y. 2012).

the elements of "bad faith," or other grounds for relief, just because the case involves single asset real estate.[7] Its parameters often dictate how a case proceeds, allowing debtors to focus their efforts on formulating and filing a meaningful plan and/or negotiating a compromise. Thus, Section 362(d)(3) protects secured creditors by "'ensur[ing] that the automatic stay provision is not abused,'" and helps debtors by affording them an "'opportunity to create a workable plan of reorganization.'" *LDN*, 191 B.R. at 326 (quoting S. Rep. No. 103-168, 1st Sess. (1993)).

## III.

On a motion for relief from the automatic stay, the moving party "has the burden of proof on the issue of the debtor's equity in property" (11 U.S.C. § 362(g)(1)), and the debtor "has the burden of proof on all other issues" (11 U.S.C. § 362(g)(2)). *See also In re Elmira Litho, Inc.*, 174 B.R. 892, 900 (Bankr. S.D.N.Y. 1994) (distinguishing between the initial burden of going forward and the ultimate burden of persuasion). The parties are required to meet their respective burdens by a preponderance of the evidence.

The Debtors argue that in order to grant the motion, this Court must find they "can present no plan and have no likelihood of reorganizing." ECF No. 86 at 11. They also contend Fannie Mae has the burden of proof with respect to the Property's value, and absent submission of an appraisal, Fannie Mae cannot argue the plan is not confirmable. *Id.* at 7. The Debtors grossly mischaracterize the parties' burdens and the standard for relief under Section 362(d)(3).

The proper allocation of burdens and appropriate standard under subsection (d)(3) can be illustrated by comparison to subsections (d)(1) and (d)(2). A creditor moving under Section

---

[7] As one court notes, applying a "mechanical approach" to the bad faith factors "would automatically doom almost every single asset case, ab initio." *In re Willows of Coventry, Ltd. P'ship*, 154 B.R. 959, 967 (Bankr. N.D. Ind. 1993). Under Second Circuit precedent, the critical consideration for bad faith is whether "'it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy . . . .'" *C-TC 9th Ave. P'ship*, 113 F.3d at 1309 (quoting *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir. 1991)).

362(d)(2) must demonstrate lack of equity under (d)(2)(A) as this burden is squarely placed on

the moving party by Section 362(g)(1). As explained by the Supreme Court, once the creditor

demonstrates lack of equity, "it is the burden of the *debtor* to establish that the collateral at issue

is 'necessary to an effective reorganization'" under (d)(2)(B). *United Sav. Ass'n of Tex. v.

Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 484 U.S.

365, 375 (1988) ("*Timbers*"). The debtor's burden "is not merely a showing that if there is

conceivably to be an effective reorganization, this property will be needed for it; but that the

property is essential for an effective reorganization *that is in prospect*." *Id.* at 375-76. For an

effective reorganization to be in prospect, "there must be a reasonable possibility of a successful

reorganization within a reasonable time." *Id.* at 376 (internal quotation marks omitted).

The standard announced in *Timbers* is quite similar to the language Congress later used in

11 U.S.C. § 362(d)(3)(A). Thus, there are many cases interpreting (d)(2)(B) that are instructive

on a motion under Section 362(d)(3). *See Pegasus Agency, Inc. v. Grammatikakis (In re Pegasus

Agency, Inc.)*, 101 F.3d 882, 887 (2d Cir. 1996) ("*Pegasus*") (reversing lower court and holding

stay relief must be granted where "the reorganization plan's unfounded assumptions and dubious

calculations rendered it entirely unreliable, and there is, therefore, no prospect of an effective

reorganization under any calculation of the debt"); *John Hancock Mut. Life Ins. Co. v. Route 37

Bus. Park Assocs.*, 987 F.2d 154 (3d Cir. 1993) ("*John Hancock*") (reversing order denying stay

relief where plan was predicated on impermissible gerrymandering of classes); *In re 18 RVC,

LLC*, 485 B.R. 492 (Bankr. E.D.N.Y. 2012) (granting stay relief based on the debtor's inability

to confirm a plan over objection of mortgagee); *266 Washington*, 141 B.R. at 278 (same).

However, there are also significant differences between (d)(2) and (d)(3). For one,

Section 362(d)(3) does not contain an analogue to Section 362(d)(2)'s lack-of-equity prong.

Relief from the stay can be granted under Section 362(d)(3) regardless of whether the debtor has equity in the property. This is consistent with Section 362(d)(3)'s mandate that single asset real estate cases be dealt with expeditiously. If the creditor had the burden on value, it would be required to obtain an appraisal before making a motion under Section 362(d)(3), and upon contradictory proof by the debtor, an evidentiary hearing would likely be needed. Analogously, courts have refused to read a creditor's burden of establishing lack of equity into Section 362(d)(1). As stated by one court, "[t]he debtor's lack of equity is an element of a § 362(d)(2) motion" and "is immaterial to the secured creditor's case under § 362(d)(1) . . . ." *Elmira Litho*, 174 B.R. at 904. Significantly, "if the debtor raises the existence of an equity cushion to demonstrate adequate protection, the debtor – not the secured creditor – must prove it notwithstanding the provisions of § 362(g)." *Id.*[8]

Another difference between (d)(3) and (d)(2) is that Section 362(d)(3)(A) calls for scrutiny of a plan, but an analysis under (d)(2)(B) need not include consideration of an actual plan. *Timbers* speaks of a "reasonable possibility of a successful reorganization within a reasonable time," but Section 362(d)(3)(A) is far more focused. It mandates stay relief unless "the debtor *has filed a plan of reorganization that has* a reasonable possibility *of being confirmed* within a reasonable time . . . ." 11 U.S.C. § 362(d)(3)(A) (emphasis added). A closely related difference is that under Section 362(d)(2), the level of scrutiny depends on the stage of the case. *See generally Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643 (Bankr. W.D.N.Y. 1992). *Timbers* recognized that bankruptcy courts require less detailed showings from debtors in response to motions pursuant to Section 362(d)(2) that are made in the first four months of the case. 484 U.S. at 376. The relevance of this timeframe is

---

[8] Likewise, payments under Section 362(d)(3)(B) are not the same as or a substitute for adequate protection payments under 362(d)(1). *See In re Erie Playce LLC*, 441 B.R. 905, 908 (Bankr. N.D. Ill. 2010).

that, as a general rule, debtors have a 120-day exclusive period to file a plan. 11 U.S.C. §

1121(b). Thus, "[d]uring the exclusivity period, a debtor's evidentiary burden is relatively light

in order to allow the debtor an opportunity to negotiate a plan that is reasonably confirmable

within a reasonable time." *In re Kent Terminal Corp.*, 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994)

(explaining that "[a]s time passes and the debtor's exclusivity period expires, the debtor must

meet a somewhat higher standard, i.e., that confirmation of the proposed plan is not only possible

but 'probable'"). By contrast, Section 362(d)(3)(A) requires a debtor to show its hand 30 days

*before* the expiration of the exclusivity period, and *that plan* must have a reasonable possibility

of being confirmed within a reasonable time. For this reason, Section 362(d)(3) is not as elastic

as Section 362(d)(2), and does not permit a wait-and-see approach.

On a motion under Section 362(d)(3), the creditor bears the initial burden of

demonstrating the quantum of its claim and its security interest in the real property. The debtor

must establish that a reorganization based on its plan is in prospect. If the value of the property is

dispositive of whether the plan has a reasonable possibility of being confirmed within a

reasonable period of time, then the debtor bears the ultimate burden of persuasion with regard to

value. In a dispute concerning the amounts required to be paid pursuant to 11 U.S.C. §

362(d)(3)(B)(ii), the creditor will have the burden of establishing it has a secured interest in the

property and the amount of its claim, and the debtor will have to demonstrate it timely made or

proffered payments equal to the nondefault contract rate of interest on the value of the creditor's

interest in the real estate.

As the foregoing implies, the debtor's plan will be measured against 11 U.S.C. § 1129's

confirmation requirements. However, the debtor's burden is less onerous under Section

362(d)(3)(A) than it is at confirmation; a debtor need not prove that its plan *shall be* confirmed.

A mini-confirmation hearing is not required, nor is it appropriate, absent good reason to continue to restrain the lender from exercising its rights. While the debtor's plan does not have to be perfect, the plan, together with the evidence and the debtor's arguments, must delineate a credible path to reorganization. Hurdles to plan confirmation must be addressed in a way that provides the court with grounds to conclude (i) it is more likely than not they will be overcome, and (ii), because there is a time element, they can be overcome promptly. Unless the plan has a true prospect of being confirmed within a reasonable time, or timely payments have been made, a secured creditor should not be compelled to endure further delay, expense, and risk.

## IV.

The Debtors filed their plan on December 19, 2012, a date within the 90-day period allowed by Section 362(d)(3), and filed an untimely, amended plan on March 11, 2013.[9] The plan classifies five classes of claims. ECF No. 91 Art. III. Of these classes, four are characterized as impaired: Class 2 (Fannie Mae's secured claim), Class 3 (tenant security depositors); Class 4 (general unsecured claims), and Class 5 (the Debtors' equity holders). *Id.* Art. IV; *but see Id.* Art. III ("Class 3 is not Impaired.").

The plan operates under the assumption that Fannie Mae's claim is $12,379,715.90. *Id.* § 4.2(1). Critically, Fannie Mae's total claim is placed in Class 2 for the time being, subject to valuation of the Property at confirmation, at which point the deficiency claim will be classified within the general unsecured creditor class, Class 4. *Id.* § 4.2(3). Therefore, the plan only considers claims of $1,268,261 in Class 4, and proposes to pay roughly 5 percent of that amount.

---

[9] The amended plan does not differ from the original plan in any respect material to the Court's analysis; the Court will consider the amended plan and disclosure statement as part of the record on this motion. To be sure, a debtor may not file a token plan within the 90-day period and then defend a lift stay motion by arguing that its late-filed amended plan can be confirmed. While 11 U.S.C. § 1127(a) allows a debtor to file an amended plan, this general provision cannot be used as an end-run around the more specific language in Section 362(d)(3).

*Id.* § 4.4; ECF No. 86 at 6. Without separating out the secured and unsecured portions of Fannie

Mae's claim, the plan proposes to treat Fannie Mae's Class 2 claim as follows:

> (a)    from the Effective Date for the next twelve months, the
> Debtors shall pay interest only in arrears at three percent (3%);
> (b)    commencing twelve months after the Effective Date, the
> Debtor shall make level payment based upon principal amortized
> over twenty-five (25) years with interest at three percent (3%);
> (c)    on the sixtieth (60) month following the Effective Date, the
> Debtor shall pay all remaining principal under the Amended Note;
> (d)    if Class 2 elects treatment under Section 1111(b),
> commencing on the effective date, the Debtor shall make a
> monthly payment equal to the Allowed Class 2 claim, which shall
> be considered the Class 2 Secured Claim, divided by three-hundred
> (300) for three hundred (300) months until paid in full;
> (e)    Class 2 shall retain its liens to the extent of its Secured
> Claim until paid in full.

ECF No. 91 § 4.2(3). The plan will be funded by the Debtors' continued operations, and a

$250,000 infusion of working capital by the Debtors' equity holders to address any cash flow

deficiencies. *Id.* § 6.8. The plan also provides that the equity holders will retain their interests in

the Debtors. *Id.* § 4.5.

The Debtors' plan is uninformative, speculative, and divorced from the facts of this case.

Neither the plan nor the disclosure statement indicates the circumstances that caused the Debtors

to default in July 2012. The Debtors' plan and opposition papers leave the critical issues of

feasibility under 11 U.S.C. § 1129(a)(11) and fair and equitable treatment of Fannie Mae's

secured claim under 11 U.S.C. § 1129(b)(2) to be resolved after a judicial determination of the

value of the Property and the presentation of evidence at a confirmation hearing. ECF No. 86 at

7-8. But there are no grounds to hold the confirmation hearing imagined by the Debtors. Fannie

Mae objects to the plan, and based on the hypothetical values and projections offered by the

Debtors, will hold a deficiency claim of millions of dollars. This fact creates two discreet but

insoluble impediments to confirmation. The first concerns whether the Debtors can demonstrate

the likelihood that at least one impaired class of claims will accept their plan. The second is whether the Debtors can establish that their plan does not violate the absolute priority rule. Rather than trundle through the minefield of problems raised by the Debtors' plan, the Court will focus just on these two issues.

## V.

A plan proponent has "two distinct avenues for confirmation of a reorganization plan [under 11 U.S.C. § 1129], one grounded on the consent of impaired classes of claims and the other hinged on a judicial cram down over the objections of impaired classes." *266 Washington*, 141 B.R. at 282. Consensual confirmation is possible if each requirement of 11 U.S.C. § 1129(a) is met, including (a)(8), which requires acceptance of the plan by each impaired class of claims. Class acceptance requires an affirmative vote by at least one-half in number and at least two-thirds in amount of claims casting a ballot. 11 U.S.C. § 1126(c). The existence of even one impaired dissenting class precludes consensual confirmation and necessitates resort to cramdown under Section 1129(b).

Section 1129(b) requires that all provisions of subsection (a) are met, excluding (a)(8), and that the plan does not discriminate unfairly and is fair and equitable to each dissenting impaired class. 11 U.S.C. § 1129(b)(1). Significantly, the Bankruptcy Code does not permit cramdown of a plan that is not accepted by even one impaired class. Under Section 1129(a)(10), at least one impaired class, excluding the votes of insiders, must accept the plan for a debtor to proceed to cramdown. This provision plays a vital gatekeeper function. As explained by one court, Section 1129(a)(10) "ensures that prior to embarking upon the tortuous path of cramdown and compelling the target of cramdown to shoulder the risks of error necessarily associated with a forced confirmation, there is a showing that some group hurt by the plan favors the plan." *In re*

*Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995) ("*Varriale*") (internal quotation marks omitted).

Section 1129(a)(10)'s power is often most apparent in single asset real estate cases. Consistent with the two-party nature of such disputes, the impaired classes normally include insiders, the lender, and, depending on the case, a relatively modest group of unsecured creditors. As result of this, and by operation of 11 U.S.C. §§ 506(a), 1111(b)(1), and 1122(a), lenders often dominate the relevant impaired classes and prevent satisfaction of Section 1129(a)(10).

Under Section 506(a), "a lender's secured claim is limited to the value of its collateral; the remainder of the claim, if any, is an unsecured claim . . . ." *266 Washington*, 141 B.R at 283. Section 1111(b)(1)(A) provides that "[a] claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 . . . the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse . . . ." 11 U.S.C. § 1111(b)(1)(A). This provision trumps 11 U.S.C. § 502(b)(1), which disallows claims, including recourse claims, if they are unenforceable under the parties' contract or applicable law. And under Section 1111(b)(2), an undersecured creditor can elect to have its entire claim treated as secured by the debtor's collateral, notwithstanding the actual value of the collateral and 11 U.S.C. §§ 506(a) and 502(b)(1).

An undersecured creditor will thus have both a secured claim (equal to the value of the property) and an unsecured deficiency claim (equal to the difference between the total amount of its claim and the value of the property). Unless an undersecured creditor elects to have its claim treated as fully secured under Section 1111(b)(2), it will be able to cast a vote based on both its secured and unsecured claims. Although single asset real estate debtors have fought this point, under 11 U.S.C. § 1122, the provision dealing with the classification of claims, a lender's

deficiency claim is classified properly within the class of general unsecured creditors. *Boston Post Road*, 21 F.3d at 483 ("The purpose of the Section 1111(b) election is to allow the undersecured creditor to weigh in its vote with the votes of the other unsecured creditors. Allowing . . . [separate classification] would effectively nullify the option that Congress provided to undersecured creditors to vote their deficiency as unsecured debt."). With only a relatively small number of other general unsecured claims, and no other legitimately impaired voting classes, an undersecured creditor's dissent will likely prevent fulfillment of Section 1129(a)(10). Said another way, a substantial deficiency claim held by a recalcitrant lender will almost always sound the death knell in a single asset real estate case.

Fannie Mae argues that based on the size of its claim, the value of the Property relied on by the Debtors in the plan, and the amount of the general unsecured claims, its deficiency claim will control the general unsecured creditor class. As Fannie Mae is steadfastly opposed to confirmation of the plan, this would render satisfaction of Section 1129(a)(10) impossible. ECF No. 77 at 6. Fannie Mae's evidence includes its proof of claim; the declaration and exhibits, including the loan documents, attached to its first motion to lift the automatic stay (ECF No. 33); a supplemental declaration by the same affiant (ECF No. 79); the Debtors' petition; various budgets submitted by the Debtors in connection with their use of cash collateral; and the Debtors' plan and disclosure statement. Fannie Mae's proofs of claim are *prima facie* evidence of the validity and quantum of its claims (Fed. R. Bankr. P. 3001(f)), and the Debtors did not object to these claims or present evidence to rebut them. Based on the evidence presented, including Fannie Mae's claim, its security interest in the Property and the rents, and the facial deficiency of the Debtors' plan, Fannie Mae has stated a *prima facie* case.

Prior to the hearing on the motion it appeared the Debtors' response was that this argument was (i) premature (Fannie Mae had not yet decided if it would make a Section 1111(b)(2) election) and (ii) unsupported (Fannie Mae had not met its burden of establishing the value of the Property, and thus the extent of its deficiency claim was unknown). ECF No. 86 at 6-7. At the hearing, the Debtors raised a new concept: Class 3 was the impaired class that could satisfy Section 1129(a)(10). The Court will address these arguments separately.

Fannie Mae, the creditor with far and away the greatest stake in this case, has stated its intention in no uncertain terms to vote against the plan that has been proffered. There is no dispute as to its claim of over $12.3 million or the amount of $1,268,261 in unsecured claims. The liquidation analysis in the disclosure statement provides a $5 million foreclosure value of the Property. ECF No. 92 at 10. The Cash Flow Analysis appended to the original disclosure statement lists the projected sales prices of the Property over a five-year period: $5,049,712 in year 1; $5,310,532 in year 2; $5,928,125 in year 3; $6,351,085 in year 4; and $6,266,336 in year 5. ECF No. 55-1. The Cash Flow Analysis attached to the amended plan "spruces up" these numbers: $6,060,376 in year 1; $6,341,409 in year 2; $6,979,620 in year 3; $7,423,610 in year 4; and $7,360,312 in year 5. ECF No. 91-1. Even under the $7,423,610 value, Fannie Mae would hold approximately 80 percent of the vote, which is more than sufficient to block acceptance by the unsecured creditor class. Assuming all the unsecured creditors voted, and all of them voted to accept the plan, the Property would have to be worth in excess of $11.6 million (leaving Fannie Mae with a deficiency claim of less than $700,000) for those votes to satisfy the requirements of Section 1129(a)(10).

Under Section 362(d)(3)(A), the Debtors must demonstrate that they can plausibly overcome the clear obstacle to confirmation presented by Section 1129(a)(10). The Debtors'

technical arguments do not come close to fulfilling this mandate for reasons that cut far deeper than misstating the burden on the issue of value. Based on the calculations above and what the plan offers Fannie Mae, it is pure fantasy to think that Fannie Mae would make a Section 1111(b)(2) election or that an appraisal would make any difference.[10] In their heart of hearts the Debtors appear to recognize this sobering reality: not only do they decline to offer an appraisal or other evidence, *they do not even argue* that an appraisal would be sufficient to stifle Fannie Mae's blocking power.

But what the Debtors fail to appreciate is that if they cannot make this argument, the inquiry must end. The Debtors' position is essentially that the case should proceed to a dual valuation/confirmation hearing *just in case* the Property turns out to be worth a lot more than anyone is at present willing to say it is; or *just in case* Fannie Mae makes a Section 1111(b)(2) election. Even under Section 362(d)(2), courts routinely grant stay relief when a debtor's reorganization is predicated on such wishful thinking. *Pegasus*, 101 F.3d at 887 (citing cases).

The Debtors also have not established that Class 3, the class of tenant security depositors, is a legitimately impaired class.[11] As a threshold matter, it is unclear whether Class 3 is impaired based on its proposed treatment under the plan. Under the plan, the Class 3 claims of $210,461:

> [S]hall be paid in full, per Tenant, upon each tenant's move out date, if said tenant is entitled to the repayment of said Security Deposit pursuant to the terms of his or her lease. The funding for the payments shall come from the operation and rental income of the Debtor. The claims, if any, of the Tenants, accruing after the Petition Date shall be paid on a current basis.

ECF No. 91 § 4.3. As the plan provides for full repayment of security deposits pursuant to the leases, there does not appear to be any alteration of the tenants' statutory or contractual rights.

---

[10] At oral argument Fannie Mae made clear it had no intention of making a Section 1111(b)(2) election.

[11] The Debtors list the security depositors as priority claims on Schedule E – Creditors Holding Unsecured Priority Claims ("Schedule E"). ECF No. 30. Schedule E lists 384 tenants owed security deposits ranging from $80 to $2,425, for an average of about $554 per tenant. *Id.*

*Cf.* ECF No. 91 § 3.3 ("Class 3 consists of the Unsecured Claims of the Debtor's Tenants . . .

entitled, upon termination of lease, to receive security deposits. Class 3 is not Impaired.").

The Debtors suggested at the hearing that these claims are impaired because the tenant

security deposits were not separately escrowed, but this argument is not sufficient to sustain their

burden of establishing that Class 3 can be deemed a validly impaired class. Other than counsel's

vague allusions at oral argument, the Debtors have not provided any explanation or evidence

concerning the "what," "why," and "when" of their handling of the security deposits. Nor have

they directed the Court to any Indiana authority that sheds light on the issue.[12] *See, e.g.*, *In re All*

*Land Invs., LLC*, 468 B.R. 676, 691 (Bankr. D. Del. 2012) ("The record does not reveal how the

Class 1 claimants' rights have been altered, if at all. 'A plan which 'leaves unaltered' the legal

rights of a claimant is one which, by definition, does not impair the creditor.'") (quoting *Solow v.*

*PPI Enter. (U.S.), Inc. (In re PPI Enter. (U.S.), Inc.)*, 324 F.2d 197, 204 (3d Cir. 2003)). *Cf. In re*

*Gramercy Twins Assocs.*, 187 B.R. 112, 116 (Bankr. S.D.N.Y. 1995) ("*Class VI* is comprised of

security deposit claims by the tenants of the Property totaling approximately $149,375.66. . . .

[M]embers of this class will receive the full amount of their claims. As an unimpaired class, it

was excluded from the vote on confirmation.").

The Court has not tarried long on Indiana law, because under Second Circuit precedent it

is clear that the Class 3 tenants do not have a claim against the Debtors' estate as a matter of

bankruptcy law. In *Boston Post Road*, the Second Circuit described why tenant security deposit

claims are not entitled to vote when a plan, like the one in this case, is silent on the issue of

acceptance or rejection of tenant leases:

> In this case, the Class 3 tenant security depositors could not
> constitute a voting class of creditors for purposes of effecting

---

[12] The Court's own research indicates that Indiana law does not explicitly prohibit the commingling of security deposits with general operating funds. *See, e.g.*, Ind. Code § 32-31-3-9 (defining a security deposit).

18

cramdown. Any claim for return of tenant security deposits would arise from the lease between the debtor and the tenant. Under the Bankruptcy Code, unexpired leases must be assumed or rejected by the Debtor. 11 U.S.C. § 365. When, as in the instant case, the Debtor does neither, the leases continue in effect and the lessees have no provable claim against the bankruptcy estate. [*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1281 (5th Cir. 1991), *cert. denied*, 506 U.S. 821 (1992).] The obligations assumed by the debtor under the continued leases constitute post-petition administrative claims. *See* 11 U.S.C. § 503(b)(1)(A). Such administrative claims are defined as priority claims under 11 U.S.C. § 507(a)(1), and must be paid in full in cash pursuant to 11 U.S.C. § 1129(a)(9)(A); their holders are not entitled to vote on a plan of reorganization.

21 F.3d at 483-84; *see Barakat v. Life Ins. Co. of Virginia (In re Barakat)*, 99 F.3d 1520, 1528 (9th Cir. 1996) (same); *In re Cantonwood Assocs. Ltd. P'ship*, 138 B.R. 648, 656 (Bankr. D. Mass. 1992) (same). *But see In re Duval Manor Assocs.*, 191 B.R. 622 (Bankr. E.D. Pa. 1996). Regardless of whether the Debtors explicitly assume the leases under 11 U.S.C. § 365 or the plan is silent on that issue, they are required to pay the tenants pursuant to the leases. In either event, the tenants do not have claims for purposes of voting on the plan.[13] And rejection of the leases would give rise to tenant claims that presumptively would be classified within the general unsecured class, Class 4. *See generally 266 Washington*, 141 B.R. at 282. Even with the added tenant claims, Fannie Mae's deficiency claim would still easily control Class 4.

Moreover, it would appear that the Debtors seek impermissibly to impair the tenant class for the sole purpose of complying with Section 1129(a)(10). As one court explains:

"Artificial" impairment occurs when a plan imposes an insignificant or de minimis impairment on a class of claims to qualify those claims as impaired under § 1124. The chief concern with such conduct is that it potentially allows a debtor to

---

[13] Although the Debtors' filing may have acted as a stay against the repayment of security deposits, this would not result in impairment for plan purposes. *See, e.g.*, *In re Mangia Pizza Invs., LP*, 480 B.R. 669, 690 (Bankr. W.D. Tex. 2012) ("Any impairment to the funds thus far has been the result of the automatic stay provisions of the Bankruptcy Code, not because of the treatment under the Plan. Therefore, HEB's rights remain unaltered.").

> manipulate the Chapter 11 confirmation process by engineering
> literal compliance with the Code while avoiding opposition to
> reorganization by truly impaired creditors.

*In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 (3d Cir. 2004). Courts have taken different

views on *de minimis* impairment of claims. While some note the Bankruptcy Code does not

expressly prohibit it, "the majority view continues to be that artificial impairment runs afoul of

the requirements for Chapter 11 confirmation." *Fed. Nat'l Mortg. Ass'n v. Village Green I, GP*,

483 B.R. 807, 817 (W.D. Tenn. 2012); *see In re 183 Lorraine St. Assocs.*, 198 B.R. 16, 30

(E.D.N.Y. 1996) (noting that courts within the Second Circuit "have looked with disfavor upon

the 'artificial' impairment of claims").[14]

As a general rule, the determination of whether a class is artificially impaired requires

consideration of whether the class is impaired (i) for a proper business purpose or (ii) to

manipulate the voting process in order to fulfill Section 1129(a)(10). As stated by one court,

"[t]here must be a showing that the proposed impairment is necessary for economical or other

justifiable reasons and not just to achieve 'cram down.'" *Varriale*, 188 B.R. at 760. The Debtors

do not explain or provide evidence concerning the impairment of the tenant class, and therefore

have not met their burden of establishing a valid business purpose for the proposed impairment.

At the same time, there are indicia of impermissible artificial impairment. For one, based

on the Debtors' current projections and/or the purported ability of the Debtors' principals to

contribute $250,000, it would appear that the Debtors can (i) remit the *de minimis* security

deposits on an as-needed basis or (ii) create a replacement fund. *See, e.g.*, *Id.* (stating that the

debtor's admission it could pay a higher claim if necessary was "fatal to its argument that a valid

business reason motivated the proposed" impairment of a lesser claim). For another, the

---

[14] Courts in the Second Circuit sometimes consider this issue in the context of good faith under 11 U.S.C. § 1129(a)(3). *See, e.g.*, *In re Quigley Co.*, 437 B.R. 102, 126 (Bankr. S.D.N.Y. 2010) (noting that the Second Circuit had not yet addressed whether artificial impairment should be considered under Section 1129(a)(10) or (a)(3)).

$210,461 in tenant security deposit claims is a mere 1.7 percent of Fannie Mae's total claim. Under these circumstances, allowing the tenant class to be used to cramdown a plan over Fannie Mae's objection "is simply inconsistent with the principles underlying the Bankruptcy Code." *Boston Post Road*, 21 F.3d at 483; *see Varriale*, 188 B.R. at 760 ("Allowing an 'artificially impaired' class to satisfy the 11 U.S.C. § 1129(a)(10) requirement would nullify the protection it was designed to provide and would promote 'side dealing' between debtor and selected creditors.") (quoting *Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin., Inc. (In re Windsor on the River Assocs., Ltd.)*, 7 F.3d 127, 132 (8th Cir. 1993)).

## VI.

Assuming the Debtors were able to overcome the seemingly insurmountable obstacle to confirmation of obtaining acceptance by a legitimately impaired class – and also be able to satisfy the other provisions of Section 1129(a), excluding (a)(8) – they would then have to demonstrate that the plan does not discriminate unfairly and is fair and equitable to each dissenting impaired class. 11 U.S.C. § 1129(b)(1). For holders of unsecured claims, fair and equitable treatment requires that such holders receive property of a value equal to the allowed amount of their claims, failing which the plan must satisfy 11 U.S.C. § 1129(b)(2)(B)(ii), which codifies the absolute priority rule. "[T]he absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganization plan." *Nw. Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (internal quotation marks and alterations omitted).

Notwithstanding this rule, old equity can retain their interests in the debtor if they contribute "new value." Under this exception, "the capital contribution by old equity must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization

and (5) reasonably equivalent to the property that old equity is retaining or receiving." *BT/SAP Pool C Assocs. v. Coltex Loop Cent. Three Partners*, 203 B.R. 527, 534 (S.D.N.Y. 1996) ("*Coltex*"), *aff'd*, 138 F.3d 39 (2d Cir. 1998). Although the absolute priority rule and the new value exception are derived from a different context altogether, they are most often addressed now in single asset real estate cases. *See, e.g.*, *Ahlers*, 485 U.S. at 202; *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 443 n.15 (1999) ("*LaSalle*") (noting that single asset real estate cases are the "typical [context] in which new value plans are proposed"). The reason for this stems from the two-party nature of such cases, and is reflected in the following passage:

> In essence, from the debtor's perspective, the proposed new value is like putting money in the bank. The debtor's principals put the money in, and presumably the value of the [property] will increase which inure[s] to the benefit of the debtor's principals (who may "withdraw" the increased value by selling the property in the future). In the meantime, the secured creditor, who bargained for a first lien position, runs the ultimate risk of the project's failure with no upside potential. Such a result is not fair and equitable and violates the absolute priority rule.

*In re Miami Ctr. Assocs.*, 144 B.R. 937, 942 (Bankr. S.D. Fla. 1992). Despite the uncertainty that results from the plan's failure to address how Class 4 claims will be treated when Fannie Mae's deficiency claim is added (*see, e.g.*, ECF No. 91 § 4.4), it is clear that there will be substantial unsecured claims that will not be paid in full.[15] Nevertheless, the plan provides that equity holders will retain their interests in the Debtors. *Id.* § 4.5. Thus, the plan will violate the absolute priority rule unless the equity holders' contribution satisfies the new value exception.[16]

---

[15] *See, e.g.*, *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 654 (9th Cir. 1997) (holding that although creditor received 100 percent of its secured and unsecured claims, the plan violated the absolute priority rule as it did not "provide for payment of interest for the post-confirmation time-value of the amount of" the creditor's unsecured claim).

[16] The disclosure statement indicates the Debtors "may choose to use the New Value Exception" and that "[t]he amount of such new value is not yet determined." ECF No. 92 at 8.

Fannie Mae raised this argument (ECF No. 77 at 6), but the Debtors did not respond and therefore have not met their burden of establishing that they can overcome the impediment to confirmation presented by the absolute priority rule. In any event, several factors make satisfaction of the new value exception highly improbable. First, as held by the Supreme Court in *LaSalle*, the Debtors' plan is "doomed" because it "vest[s] equity" in the Debtors' principals "without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan." 526 U.S. at 454; *see Coltex*, 203 B.R. at 535 (stating that the "debtor must show not only that it needs funds to reorganize but rather that it is necessary for *old equity* to contribute those funds"). Second, the contribution appears to depend on a potential deficiency in the projections and therefore cannot be considered as new value. *Gramercy Twins Assocs.*, 187 B.R. at 126-27 (concluding contingent contribution could not be considered new value). Third, the Debtors have not established that the equity holders are able to contribute $250,000 to the plan. Fourth, the Debtors' failure to provide evidence concerning value prevents them from demonstrating reasonable equivalence. *In re Multiut Corp.*, 449 B.R. 323, 354 (Bankr. N.D. Ill. 2011) (sustaining creditor's objection where plan failed "to adequately estimate the value of the Debtor's assets"). Fifth, even taking the $5 million low-end "hypothetical" liquidation value, the $250,000 contribution is only 5 percent of that value. *See, e.g.*, *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 708-09 (Bankr. S.D.N.Y. 1993) (holding contribution equaling 12.6 percent of retained value was insufficient), *aff'd*, 165 B.R. 773 (S.D.N.Y.), *aff'd*, 41 F.3d 1502 (2d Cir. 1994), *cert. denied*, 513 U.S. 1153 (1995). Finally, the proposed contribution is far too small relative to the unsecured debt in this case. *See, e.g.*, *In re Union Meeting Partners*, 165 B.R. 553, 570 (Bankr. E.D. Pa. 1994) (holding contribution of 5.9 percent of unsecured claims was not substantial), *aff'd*, 52 F.3d 317 (3d Cir. 1995).

Based on the entire record, and for the reasons stated herein, the Debtors have failed to satisfy their burden under Section 362(d)(3)(A). Indeed, the Debtors' attempt to woolgather their way to a confirmation hearing is exactly what Section 362(d)(3) is designed to guard against.[17]

**VII.**

As the Debtors did not demonstrate that the plan has a reasonable prospect of being confirmed, stay relief must be granted unless the Debtors made timely payments pursuant to 11 U.S.C. § 362(d)(3)(B). The Debtors admit that they did not commence making statutory payments within the required time (ECF No. 86-2 ¶¶ 4, 7), and therefore have not satisfied Section 362(d)(3)(B). Undaunted, the Debtors seek credit for a late payment of $18,750. Fannie Mae argues that the proper amount is over $39,000. This amount is based on a property value of $8 million and the Phase I note's interest rate of 5.87 percent. ECF No. 77 at 7 (noting that the Phase II note's contract rate is 6.92 percent). Even if late payments were permitted, and they are not, the Debtors have not demonstrated the sufficiency of the $18,750 payment.

The statute requires monthly payments equal to the nondefault contract rate of interest on the value of the creditor's interest in the property. 11 U.S.C. § 362(d)(3)(B)(ii). Instead, the Debtors calculated the payment by reference to their cash flow. ECF No. 93 at 17:12-14. The stated reason for the Debtors' alternative calculation is that the Property has not been appraised; but this is no excuse for the Debtors' failure to determine the statutory amount due within the 90-

---

[17] There are far more issues standing in the way of confirmation than the Court has addressed here. The Debtors cannot use rental collateral to fund plan payments over Fannie Mae's objection. *See, e.g.*, *In re Buttermilk Towne Ctr., LLC*, 442 B.R. 558, 566-67 (B.A.P. 6th Cir. 2010); *In re Griswold Bldg., LLC*, 420 B.R. 666, 705-06 (Bankr. E.D. Mich. 2009). Without knowing the value of Fannie Mae's secured claim, it is impossible to determine the appropriateness of the plan's proposed interest rate. Even so, it is doubtful the plan provides Fannie Mae with present value. *See, e.g.*, *Rake v. Wade*, 508 U.S. 464, 472 n.8 (1993) ("When a claim is paid off pursuant to a stream of future payments, a creditor receives the 'present value' of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments."). And, for yet another major problem, the Internal Revenue Service filed a claim of close to $7.2 million in Corp.'s case. Case No. 12-47384 (POC 2-1). This claim was not addressed by the parties; if valid, it is improbable Corp. can reorganize.

24

day period. *See* ECF Nos. 86-2 ¶ 7; 89 at 2. A better explanation, one that is reflected in the cash collateral budgets, is that the Debtors could not make a payment within the statutory period, and in tendering their late payment, simply offered as much as they could. ECF No. 77 at 4, 7. To be sure, Section 362(d)(3)(B) does not contain a pay-what-you-can exception. Even taking the Debtors' "hypothetical" liquidation value of $5 million and the Phase I note's rate of 5.87 percent, the required monthly payment under the statutory formula is over $24,000.

Based on the entire record, and for the reasons stated herein, the Debtors have failed to demonstrate compliance with Section 362(d)(3)(B).

## VIII.

Accordingly, based on the foregoing, Fannie Mae's motion for relief from the automatic stay is granted pursuant to 11 U.S.C. § 362(d)(3), except Fannie Mae's request for waiver of the 14-day stay provided by Fed. R. Bankr. P. 4001(a)(3) is denied for lack of cause shown.


**SO ORDERED:**


Dated: Brooklyn, New York
       April 4, 2013


                                        s/Jerome Feller
                                        JEROME FELLER
                                        UNITED STATES BANKRUPTCY JUDGE